# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                        Plaintiff,

v.

LEMUREL E. WILLIAMS,

                        Defendant.

Case No. 14-CR-159-JPS

ORDER

The trial of the defendant, Lemurel E. Williams, began with jury selection on Monday, November 3, 2014. (Docket #29 at 1). After the jury was sworn, the defendant brought a motion under *Batson v. Kentucky*, 476 U.S. 79 (1986), to challenge whether the United States had exercised its peremptory challenges in a racially discriminatory matter. (Docket #29 at 4). The Court noted the objection and requested that the government file a written response to the *Batson* challenge. (Docket #29 at 9). The trial ended on Wednesday, November 5, 2014, with the return of a guilty verdict against the defendant. (Docket #35). On November 13, 2014, the government filed a response to the *Batson* challenge. (Docket #38). On November 18, 2014, the defendant filed a Motion for Judgment of Acquittal (Docket #40) as well as a Motion for a New Trial (Docket #41). The motions are now fully briefed and ready for disposition. For the reasons discussed below, the Court will deny the defendant's motions and the guilty verdict will stand.

1.      FACTUAL BACKGROUND

The defendant stood trial on a single-count indictment of felon in possession of a firearm, contrary to 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The Court began jury selection on the morning of November 3, 2014, and the jury

pool, or venire, consisted of thirty people.[1] The venire members included five people who self-identified themselves as African Americans (Venire Members 1, 8, 16, 27, and 28), one who self-identified as Asian American (Venire Member 22), one who self-identified as "other" (Venire Member 18), and twenty-two who self-identified as white (Venire Members 2-7, 9-15, 19-21, 23-26 29, and 30). The Court conducted the majority of the voir dire process and the parties were later permitted to conduct individual voir dire as to certain members of the panel. The Court struck Venire Member 8 for cause on hardship grounds.[2]

Pursuant to the Court's standard jury-selection process, the government was afforded six peremptory challenges, or strikes, and the defendant was afforded ten. The parties exercised their strikes between 10:24 a.m. and 10:48 a.m.[3] The government exercised its strikes against three white venire members (Venire Members 4, 13, and 21); one Asian American (Venire Member 22); and two African American venire members (Venire Members 16 and 27). The defendant exercised his strikes against nine white venire members (Venire Members 2, 3, 6, 9, 11, 12, 15, 23, and 26); and one venire member who identified himself as other (Venire Member 18).

The Court published the names of those jurors selected at 10:48 a.m.; empaneling Venire Members 1, 5, 7, 10, 14, 17, 19, 20, 24, 25, 28, 29, and 30

---

[1] The Court notes that more than thirty possible venire members were available and present in the courtroom in the event that they were needed.

[2] The parties both agreed to strike Venire Member 8, an African American, on hardship grounds due to problems sitting for long periods of time and because she was the sole care giver for one of her parents. (Docket #29 at 4).

[3] The Court notes that all times listed throughout this Order are approximations based on the detailed minutes of the Court. (Docket #29).

(eleven who self-identified as white and two who self-identified as African American). The Court swore in the jury at 10:52 a.m., the unselected panel members were excused at 10:53 a.m., and the Court recessed at 11:01 a.m. for a break. Following the recess, counsel for the defendant immediately notified the clerk that he had a matter to take up with the Court regarding jury selection. The Court responded that it would take up the matter when the Court reconvened at 1:00 p.m. and prior to opening statements. At 1:00 p.m., the defendant indicated on the record that he was challenging how the government exercised its peremptory strikes under *Batson.* The Court indicated that the challenge was likely a "non-starter" based on the fact that two African American individuals were members of the impaneled jury. The challenge was noted for the record and the Court later allowed the parties to submit written submissions on the issue after trial.[4]

The trial lasted approximately three days. The government called ten witnesses and the defense did not call any. The parties stipulated that the defendant had a previous felony conviction. The main issue at trial was whether the defendant possessed a firearm.

The government presented evidence in support of their theory that the firearm fell from the defendant's waistband while officers pursued him. Officers found the gun while retracing the defendant's flight path. The defendant presented evidence through cross-examination that he was present in the area where the firearm was recovered with another drug-trafficker

---

[4]Shortly before closing arguments on November 5, 2014, the Court requested that the government respond to the *Batson* challenge in writing. The government indicated it believed the defendant waived his *Batson* challenge and, in any event, failed to set forth a prima facie case of racial discrimination. The government responded in writing to the challenge on November 13, 2014. (Docket #38).

who was equally likely to have deposited the firearm in the spot it was found.

The jury deliberations lasted for approximately three hours and the jury returned with a verdict finding the defendant guilty of the offense charged. The defendant requested that the jurors be polled individually. The Court complied and posed the following question to each juror: "Was this and is this your verdict with regard to defendant Lemurel E. Williams?" During the poll, one juror–Juror Number One, who was the second juror polled—replied "no" in response to the Court's question. Following the poll, the defendant asked for a side bar and asked the Court to re-poll the jury. The Court conducted the second poll in the exact same manner as the first poll. Again, Juror Number One was the only juror who responded "no" in response to the Court's question.

After the second poll, the Court instructed the jury to return to its deliberations to reach a unanimous verdict. The Court recessed at 2:45 p.m. and the defendant informed the clerk that under the circumstances of the polling it intended to move for a mistrial pursuant to Federal Rule of Criminal Procedure 31(d). Approximately ten minutes later, the jury communicated to the Court that Juror Number One indicated that she had not understood the polling question. In a note to the Court one juror wrote: "We apologize, we misunderstood the question that was presente[d] to each juror." Another juror wrote: "We have the verdict." The note was signed by two jurors other than Juror Number One.

The Court reconvened at 3:56 p.m. and the defendant moved for a mistrial regarding the polling of Juror Number One. The Court noted the objection for the record and the jury returned. At 4:08 p.m., the Court

individually questioned Juror Number One (in open court) regarding the verdict. The Court asked if Juror Number One misunderstood the Court's polling question, to which she responded "yes." The Court again received the verdict and published it. The defense then requested a third polling of the jury. On the third poll, each of the jurors, including Juror Number One, responded affirmatively. The Court dismissed the jury at 4:14 p.m. Outside the presence of the jury, the defendant renewed his motion for a mistrial and requested fourteen days to submit a formal motion in writing.

2.      *BATSON* CHALLENGE

In *Batson*, the Supreme Court reaffirmed that the government violates the Equal Protection Clause when it exercises peremptory challenges based on race. To resolve claims about the discriminatory use of peremptory challenges, the Court set out a three-part process requiring: (1) that the defendant make a prima facie case of discrimination; (2) that the government provide a race-neutral explanation for its peremptory challenges; and (3) that the trial court decide whether the defendant established that the government's stated reason is a pretext for racial discrimination. *Batson,* 476 U.S. at 94–98; *United States v. Taylor*, 509 F.3d 839, 843 (7th Cir. 2007).

Here, the defendant made a motion challenging how the United States had exercised its peremptory strikes under *Batson* after the jury was sworn in and after the balance of the venire were dismissed. In response, the United States argues that: (1) the defendant effectively waived his *Batson* challenge; and (2) in any event, the defendant failed to set forth a prima facie case of racial discrimination. As discussed in detail below, the Court first finds that the defendant waived his *Batson* challenge when he failed to object prior to the swearing in of the jury and dismissal of the rest of the venire. Second, the

Court finds, assuming no waiver, that the defendant failed to satisfy the first prong of the *Batson* test in making a prima facie case of discrimination. The Court also finds that, even if the first prong was met, the government's race-neutral explanations for its peremptory challenges were not a pretext for racial discrimination. Thus, the Court finds no equal protection violation.

### 2.1    Waiver

Neither party disputes that a *Batson* challenge must be timely. *See United States v. Chandler*, 12 F.3d 1427, 1431-32 (7th Cir. 1994) ("A timely, specific objection to the use of a peremptory challenge is requisite to a *Batson* challenge."); *Doe v. Burnham*, 6 F.3d 476, 481 (7th Cir. 1993). The issue before the Court, however, is specifically what constitutes a timely challenge.

The Supreme Court has never specifically defined timeliness for a *Batson* claim.[5] Although the Seventh Circuit has yet to rule on the issue, several circuit courts have set a clear rule requiring the objection to be timely made before the venire is dismissed. "[I]n order to preserve a *Batson* challenge, numerous circuit courts have held that counsel must timely object during the voir dire process, or at the latest before the venire is dismissed." *United States v. Reid*, 764 F.3d 528, 533 (6th Cir. 2014) (citing *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir. 1996); *Morning v. Zapata Protein (USA), Inc.*, 128 F.3d 213, 216 (4th Cir. 1997); *United States v. Contreras–Contreras*, 83 F.3d 1103, 1104 (9th Cir. 1996); *United States v. Parham*, 16 F.3d 844, 847 (8th Cir. 1994); *United States v. Maseratti*, 1 F.3d 330, 335 (5th Cir. 1993); and *United*

---

[5]In *Ford v. Georgia*, 498 U.S. 411, 423 (1991), the Court found that states retain considerable discretion to fashion their own rules governing timeliness. *Id.* ("[A] state court may adopt a general rule that a *Batson* claim is untimely if it is raised for the first time on appeal, or after the jury is sworn, or before its members are selected.").

*States v. Cashwell*, 950 F.2d 699, 704 (11th Cir. 1992)). There are strong arguments in favor of this interpretation that support judicial economy and fairness. For example, if a *"Batson* objection may be raised after the jury has been sworn and the trial begun there can be no remedy short of aborting the trial. This would permit the defendant to manipulate the system to the extreme prejudice of the prosecution and give the defendant a strong inducement to delay raising the objection until trial is underway." *McCrory,* 82 F.3d at 1247. The Court finds this reasoning persuasive.

The defense urges this Court not to adopt the above-mentioned interpretation of timeliness because several of these cases, namely, *Reid,* are inapposite because the *Batson* challenge was made for the first time on appeal—unlike here where the challenge was made only shortly after the jury was sworn-in and the rest of the venire dismissed. The Court recognizes this important difference; however, the fact remains that the cases clearly and unambiguously state that *Batson* objections must be made, at the latest, before the venire is dismissed—and not merely before the end of the trial.

Additionally, the defendant argues that "it would have been awkward for the defense in the moments after [the jury was published] to request that the Court clear the Courtroom and maintain the venire while counsel argued a *Batson* challenge." (Docket #42 at 13). The record indicates that the final jury panel was published at 10:48 a.m. (Docket #29 at 4). At 10:52 a.m. the clerk swore in the jury and at 10:53 a.m. the Court thanked and excused the unselected panel members. (Docket #29 at 4). At 11:01 a.m., the Court stood in recess and the defendant's counsel indicated to the clerk that he wished to be heard on a *Batson* challenge. (*See* Docket #29 at 4). At 1:08 p.m., the Court reconvened and the defendant made a *Batson* challenge on the record.

(Docket #29 at 4). The Court sees no reason why the defendant could not have made a *Batson* challenge during the time between the publishing of the jury and the time the rest of the panel was dismissed, nor why it would have been "awkward" to make such an objection. The defendant had all the information he needed to make such an objection once the prosecution made its final strike.

Finally, the defendant maintains that there was "no effort made here to manipulate the system to the prejudice of the prosecution" because "the challenge was made before the trial started." (Docket #42 at 13). While this very well may be true, the Court is nonetheless unpersuaded. A rule requiring *Batson* objections before dismissal of the venire panel provides a clear and precise moment for a trial court to determine whether a challenge is timely. Moreover, once the jury was sworn in, there was no effective remedy to the *Batson* challenge short of a mistrial. *See Christ v. Bretz,* 437 U.S. 28, 35 (1978) (noting that jeopardy attaches when the jury is empaneled and sworn). Moreover, the Court notes that the timing of the *Batson* objection in this case may have well been an afterthought to create the appearance of error when, in fact, there was none.

Accordingly, this Court adopts the rule that a *Batson* objection must be made prior to the dismissal of the venire. Thus, the Court finds that the defendant waived his right to a *Batson* objection in this case. However, because the Seventh Circuit has not yet specifically ruled on this issue, the Court will continue its *Batson* analysis under the three-prong test.

### 2.2 *Batson* Analysis[6]

Even if the Court were to find no waiver, the outcome would remain the same under the three-prong *Batson* test. Under the first prong, the defendant need only produce evidence sufficient to permit an inference of discrimination. *Batson*, 476 U.S. at 96. The test is not rigorous: suspicion even less than "more likely than not" suffices. *Johnson v. California*, 545 U.S. 162, 173 (2005). While defense counsel cannot merely point to a stricken juror's race, *see, e.g., Anderson v. Cowan,* 227 F.3d 893, 901-02 (7th Cir. 2000), courts have found that it is proper to compare the characteristics of stricken jurors with the characteristics of unstricken white jurors in a *Batson* challenge. *See United States v. Tayolor,* 509 F.3d 839, 844 (7th Cir. 2007) (citing *Miller-El v. Dretke,* 545 U.S. 231, 241 (2005)).

The Court finds this issue to be particularly close, and distinguishable from cases where the inference of discrimination is clear. The government used two out of its six peremptory strikes (one-third) against African Americans. However, this situation is significantly different than the issue in *Batson* where the government struck all four African American members from the panel. Here, of the four self-identified African Americans who remained on the venire after the Court had struck one juror for cause, two were empaneled on the jury that ultimately found the defendant guilty. The defendant argues the government's strikes used against the other four jurors "make sense" whereas the strikes used against the African-American jurors are suspect because none of their responses suggested they were

_____

[6]As background for consideration of the defendant's *Batson* challenge, the government stipulates that the defendant, Mr. Williams, is African American and that the government used peremptory strikes on two African American venire members. (Docket #38 at 7).

anything but appropriate jurors. The Court does not find an inference of discrimination on these facts alone. However, out of an abundance of caution, the Court will conduct the remainder of the *Batson* analysis assuming, arguendo, that there was an inference of discrimination.

Doing so, the Court looks to the second *Batson* prong; here, the government has satisfied the second *Batson* prong by providing race-neutral explanations for its peremptory challenges.[7] At the second step, the government's explanation need not be "persuasive or even plausible"; the issue is whether the explanation is non-discriminatory. *Purkett,* 514 U.S. 765, 767-68 (1995) (per curiam). The government used its second peremptory challenge on Juror Number 16, an African American man. The government struck Juror Number 16 because he had repeatedly demonstrated lack of respect for the law as well as a possible lack of candor since he did not reveal his extensive contacts with the Milwaukee Police Department and other law enforcement agencies during the general voir dire examination. The government's reasons are race-neutral, and thus satisfy the second *Batson* prong as to Juror Number 16.

The government also used its sixth peremptory strike against Juror Number 27, an African-American woman. The government provided that it used a strike against Juror Number 27 because it was concerned that she might know the defendant, was predisposed to him, or both. The government's explanation for this reasoning was that when defense counsel introduced the defendant, the case agent responsible for investigating the

---

[7]The Court has allowed the government to file its summary of the reasons for its peremptory challenges under seal to avoid publicly identifying or embarrassing any venire members as well as to maintain the confidentiality of the government's juror-selection strategy.

case saw Juror Number 27 give the defendant a very friendly smile. Further, the government provided that as a student representative at a technical institute, Juror Number 27 might favor an individual who is in conflict with a larger institution—such as a defendant who has criminal charges brought against him by the United States. The Court finds that the government's reasons are race-neutral, and thus satisfy the second prong of *Batson* as to Juror Number 27.

Finally, under the third *Batson* prong the Court finds that the government's race-neutral explanations are credible and not a pretext for discrimination. The third step "requires the [trial] court to make a finding of fact regarding the prosecutor's credibility after the prosecutor has offered a race-neutral reason for the strike." *United States v. Rutledge,* 648 F.3d 555, 556-57 (7th Cir. 2011). Credibility can be evaluated based on many factors, including: "the [proponent's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller–El v. Cockrell,* 537 U.S. 322, 339 (2003); *see also Hernandez v. New York,* 500 U.S. 352, 365 (1991) (stating that "the best evidence" of discriminatory intent "often will be the demeanor of the attorney who exercises the challenge"). Credibility can also be determined "by considering the offering party's consistency in applying its nondiscriminatory justification." *United States v. Stephens,* 514 F.3d 703, 711 (7th Cir. 2008). "[I]f a [party's] proffered reason for striking [a prospective juror of one race] applies just as well to an otherwise-similar [juror of a different race] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." *Miller–El v. Dretke,* 545 U.S. at 241; *see also United States v. Taylor,* 636 F.3d 901, 905 (7th

Cir. 2011). "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

Here, the Court finds the government's reasons to be credible and not a pretext for discrimination. As to Juror Number 16, any and all of the race-neutral reasons provided establish credible explanations for the peremptory strike. Juror Number 16 failed to acknowledge extensive contact with law enforcement regarding traffic matters even though the Court asked the venire panel about contact with law enforcement. (Docket #29 at 3). The Court finds that on these facts it is entirely reasonable for the government to question his ability to serve as an impartial juror, especially considering the juror failed to reveal this information during voir dire of the entire panel.

As to Juror Number 27, the Court finds the government's race-neutral explanation to be credible as well. The government provided the reasons that: (1) Juror Number 27 gave the defendant a very friendly smile; and (2) that she may favor individuals over larger institutions based on her job as a student representative. "[W]hen a prosecutor invokes a juror's demeanor as the race-neutral reason for the strike, 'the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.'" *United States v. McMath,* 559 F.3d 657, 665 (7th Cir. 2009) (quoting *Snyder v. Louisiana,* 552 U.S. 472, 477 (2008)). The Court finds that nothing in the prosecutors' demeanor here showed a discriminatory intent. Indeed, the government did not exercise peremptory challenges with respect to two other African-American jurors who were selected to serve on the jury. As to the juror's

demeanor, the Court has no recollection of the facial expressions of Juror Number 27 during voir dire. To be sure, a court cannot be expected to see and remember the facial expressions of all venire members at all times.[8] Further, the Court finds that the second reason provided by the government—that Juror Number 27 may favor individuals over larger institutions based on her job—to be reasonable as well and not a pretext for discrimination.

For all the reasons discussed above, the Court denies the defendant's *Batson* challenge because: (1) the issue was waived; and (2) even without waiver, the Court finds no equal protection violation under the *Batson* three-prong test. Thus, the Court will deny the defendant's request for a new trial based on the *Batson* challenge.

3.      JUDGMENT OF ACQUITTAL

The defendant moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) following the close of the government's case-in-chief and after receipt of the verdict. (Docket #29 at 9-10).   A defendant challenging the sufficiency of the evidence supporting a jury's verdict bears a "heavy burden." *United States v. Griffin,* 684 F.3d 691, 694 (7th Cir. 2012) (quoting *United States v. Olson,* 798 F.2d 1472, 1478 (7th Cir. 1992)). Courts should uphold the conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*

---

[8]This point further supports the Court's earlier finding that the *Batson* challenge was waived because the defense failed to raise it until after the jury had been sworn in and the rest of the venire panel dismissed. A contemporaneous *Batson* challenge, prior to the dismissal of the rest of the venire, would place the Court in the best situation to make these crucial factual determinations.

*v. Virginia*, 443 U.S. 307, 319 (1979). The Court must "bear in mind that 'it is the exclusive function of the jury to determine the credibility of witnesses resolve evidentiary conflicts, and draw reasonable inferences.'" *United States v. Reed,* 875 F.2d 107, 111 (7th Cir. 1989) (quoting *United States v. Marquardt,* 786 F.2d 771, 780 (7th Cir. 1986)).

To prove the defendant guilty of the offense charged in this case, the government had the burden of establishing, beyond a reasonable doubt, that: (1) the defendant had a previous felony conviction; (2) the defendant possessed the firearm; and (3) that the firearm had traveled in or affected interstate or foreign commerce. 18 U.S.C. § 922(g)(2); *United States v. Harris*, 587 F.3d 861, 866 (7th Cir. 2009). In his Rule 29 Motion, the defendant challenges only one element of the offense: whether the defendant knowingly possessed the firearm. (Docket #42 at 18).

The defendant argues that there was no evidence of the defendant's actual physical possession of the firearm, there was no evidence of his fingerprints or DNA upon the firearm, and that no witness testified that they had ever seen the defendant holding or using the firearm. At trial, the defendant presented evidence through the cross-examination of witnesses that he was present in the area where the firearm was recovered with another drug-trafficker who just as likely as he could have deposited the firearm in the spot it was found.

Here, the Court finds that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The government presented the evidence of Officer Tyler Kirkvold, who testified to seeing the defendant standing in the middle of East Ward Street in Milwaukee on June 2, 2014. Officer Kirkvold testified that, as the officers approached the

defendant, he saw the defendant tapping his rear waist area with his left hand while holding a cell phone to his ear in his right hand. Officer Kirkvold further testified that while he was directly behind the defendant, and the squad car's headlights were shining on the defendant's back, Officer Kirkvold saw a bulge on the left side of the defendant's waistband underneath the defendant's t-shirt. Officer Kirvold noted that the object underneath the bulge appeared to move with a subtle, weighted bounce. Officer Kirkvold testified that, based on his recent training regarding recognizing persons with firearms, he believed the object creating a bulge underneath the defendant's t-shirt was indeed a firearm.

Officer Kirvold testified that when he and Officer Rodriguez activated the squad car's emergency lights, he saw the defendant grab his left waistband area and run southbound down the alley. The officers testified that the saw the defendant dive over the approximately six-foot-high fence into the back yards at 2216 and 2212 South Austin Street. The officers further testified that the defendant crashed to the ground at 2212 South Austin Street, got up, ran alongside the house, and jumped over another fence toward the front of the residence. The officers lost sight of the defendant after he ran across South Austin Street. A few minutes later, Officer Kirkvold found the defendant's cell phone, with a picture of him on the front screen, and found the Ruger 9mm pistol nearby at the point where the defendant crashed to the ground after jumping the six-foot fence. The government also presented the testimony of Police Sergeant Robert Thiel, who testified that he arrived at the scene and found the defendant hiding a few blocks away from 2212 South Austin Street.

Corey McBride, one of the owners of 2212 South Austin Street, testified that neither she nor her husband own or keep a firearm at the residence. She testified that she, along with her husband, Christopher McBride, his brother, and another brother-in-law, had done yard work in the side and back of the house on May 31, 2014, and that the gun was not there at the time.

Additionally, the government presented the testimony of Sylvia Gerasch, a forensic examiner from the Milwaukee Police Department, and Nancy Napier, a DNA analyst from the Wisconsin Crime lab. Sylvia Gerasch explained why fingerprints may or may not be found on items such as firearms, and noted it is common not to find them. Nancy Napier testified that DNA testing of the firearm revealed that it contained DNA from five or more individuals. She further explained why DNA may or may not be found on firearms and noted that the result in this case was common.

Finally, the government presented evidence of a potential motive. The government presented jail calls indicating that the defendant had hidden cocaine and heroin somewhere in the area after running from the police and that he wanted his friend to pick up the drugs. DEA Special Agent Matthew McCarthy testified about the coded-drug related language that the defendant used in the calls and that drug dealers often carry guns to protect their drugs and/or drug proceeds. In another phone call, the government presented evidence that, when asked whether his fingerprints would be found on the firearm, the defendant stated: "Ah, I, I don't know. No, no, no I don't believe so."

In viewing the evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt. Although the defendant presented an alternate theory of the case, the Court finds that a rational juror could have determined that the defendant possessed the a firearm based on the evidence presented. Accordingly, the defendant has failed to meet his burden and the Court will deny the Motion for Acquittal pursuant to Federal Rule of Criminal Procedure 29.

4. MOTION TO VACATE AND GRANT A NEW TRIAL

Finally, the defendant filed a motion to vacate and to grant a new trial pursuant to Federal Rule of Criminal Procedure 33. Rule 33 allows the court to grant a new trial "if the interest of justice so requires." The defendant argues that the Court abused its discretion after the jury initially returned its guilty verdict by: (1) continuing the polling after Juror Number One gave her negative answer; (2) not declaring a mistrial or giving Seventh Circuit Jury Instruction 7.03 (Unanimity/Disagreement Among Jurors) following the second round of polling; and (3) not conducting individual voir dire of Juror Number One after the third round of polling to determine whether she had been coerced into finding the defendant guilty. For the reasons discussed below, the Court is unpersuaded by the defendant's argument and, therefore, will deny the motion to vacate the trial.

4.1 Polling of the Jury

First, the Court did not abuse its discretion in continuing to poll after Juror Number One gave her negative answer. Federal Rule of Criminal Procedure 31(d) provides the right to poll the jury, and states:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

Fed.R.Crim.P.31(d). The purpose of the right is to determine unequivocally that "each of the jurors approves of the verdict as returned; that no one has been coerced or induced to sign a verdict to which he does not fully assent." *Humphries v. District of Columbia*, 174 U.S. 190, 194 (1899); *accord United States v. Shepard,* 576 F.2d 719, 725 (7th Cir. 1978). One obvious consequence of this process is that the numerical division of the jurors will be revealed in the courtroom. The purpose of the poll is not to interfere with the deliberative process, but rather to insure that the defendant was convicted by a unanimous verdict. *Humphries,* 174 U.S. at 194. Whether the method employed in conducting a jury poll is coercive must be evaluated on the facts and circumstances of the particular case and not simply because the trial judge continued to poll the jury after a juror dissented from the reported verdict. *See United States v. Dorsey,* 865 F.2d 1275, 1277 (D.C. Cir. 1989) *(*citing *Jenkins v. United States*, 380 U.S. 445, 446 (1965)).

Here, the defendant argues that the Court erred when it continued to poll the remaining ten jurors after Juror Number One had expressed possible disagreement. Without any legal citation, the defendant contends that disclosing the numerical division of the jury in open court "arguably placed additional pressure upon [Juror Number One] that she was the lone dissenter." (Docket #42 at 22). The government argues that the defendant forfeited any objection he might have had by failing to object. The Court agrees with the government. At no point did the defendant specify that the

Court should stop the polling as soon as any juror expressed disagreement with the verdict. Following the first polling of the jury, the Court held a side bar with counsel, during which the defendant made no request to stop the polling of the jury if Juror Number One dissented again. Nor did the defendant object at any point during either the first or second poll.

Moreover, the Court's decision to complete polling of the jurors after the one juror expressed disagreement with the verdict is committed to the Court's discretion. *United States v. Carroway,* 108 F.3d 745, 751 (7th Cir. 1997) (citing *United States v. Gambino*, 951 F.2d 498, 501 (2d Cir.1991) (collecting cases), *cert. denied*, 504 U.S. 918 (1992)). "[T]he weight of authority suggests that when the trial judge continues to poll the jury after one juror disagrees with the verdict, reversible error occurs only when it is apparent that the judge coerced the jurors into prematurely rendering a decision and not merely because the judge continued to poll the jury." *Gambino,* 951 F.2d at 501; *accord United States v. Fiorilla,* 850 F.2d 172, 174 (3d Cir. 1988)*, cert. denied,* 488 U.S. 966 (1988); *Amos v. United States,* 496 F.2d 1269, 1272 (8th Cir. 1974); *United States v. Brooks,* 420 F.2d 1350, 1354 (D.C. Cir. 1969).

Here, the defendant points to no evidence of coercion other than the Court's continued polling. Indeed, the Court published the guilty verdict and there was no indication of any possible dissension between the jurors until the moment Juror Number One replied, "no," during the polling process. As such, the Court finds that it was well within its discretion to continue polling the jury and will deny the Motion to Vacate on this ground.

4.2     Court's Discretion to Continue Jury Deliberations

Second, the Court finds that it properly exercised its discretion in directing the jury to continue its deliberations. Federal Rule of Criminal

Procedure 31(d) provides that if a "poll reveals lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury." *Carraway* provided several factors to guide a court in excising its discretion, including: (1) the jury's own collective belief that it cannot reach a unanimous verdict; (2) the length of time that the jury has already deliberated; (3) the length of the trial; (4) the complexity of the issues that the jury must decide; (5) communications between the judge and jury; and (6) the impact that the jurors' exhaustion and the coercive threat of further deliberations might have upon the verdict. *Carroway,* 108 F.3d at 751.

The defendant argues that "the relative shortness of the trial, the lack of complexity of the issue the jury had to decide, together with the circumstances of the communications between [Juror Number One] and the Court and concern about coercion" required "something other than a mere order to continue to deliberate." (Docket #42 at 24). The Court disagrees. The jury gave no indication that it believed it could not reach a unanimous verdict; indeed, the jury "had, after all, signed a unanimous verdict as to [the defendant]" and the reasons for the objecting juror's thoughts were unknown at the time. *See Carroway,* 108 F.3d at 752. Additionally, the length of the trial was relatively short (less than 3 days), and the complexity of the issue was fairly simple with only one claim against one defendant. The Court's only communication with Juror Number One took place on the record, in open court, during the jury polling, and there are no facts to suggest coercion. Finally, the jury had deliberated less than three hours and the Court finds it unlikely that juror "exhaustion" had any threat of coercion on further deliberations. Thus, the Court finds that a mistrial was not

necessary and that the Court properly exercised its discretion in instructing the jury to deliberate further.

Finally, the Court is unpersuaded by the defendant's argument that the situation was akin to a deadlocked jury, and therefore the Court should have given additional instruction. Seventh Circuit Jury Instruction 7.03: "Unanimity/Disagreement Among Jurors," also known as a *Silvern* instruction,[9] is required when a jury is deadlocked. *United States v. Willis,* 523 F.3d 762, 775 (7th Cir. 2008); *United States v. Miller,* 159 F.3d 1106, 1110 (7th Cir. 1998). The Court has broad discretion in handling the jury and deciding when it is deadlocked. *Miller,* 159 F.3d at 1110. Here, the Court was well within its discretion in finding that the jury was not deadlocked and, therefore, that no *Silvern* instruction was necessary for further deliberation. Thus, the Court denies the defendant's motion to grant a new trial on these grounds.

### 4.3    Individual Polling–Juror Number One

Finally, the Court finds that it did not abuse its discretion by failing to conduct individual voir dire of Juror Number One following the third round of polling. The record indicates that, at approximately 2:44 p.m., the Court directed the jury to return to its deliberations to reach a unanimous verdict. (Docket #29 at 10). At approximately 2:54 p.m., the Court received a note from the jury which stated, "We apologize, we misunderstood the question

---

[9]The instruction is derived from *United States v. Silvern,* 484 F.2d 879 (7th Cir. 1973). In so many words, the instruction gently urges the jury to continue deliberating, reminding each juror to listen to the other jurors and to be open to the opinion of others without surrendering her honest beliefs. *Willis,* 523 F.3d at 775.

that was presented to each juror. We have the verdict." (Docket #34).[10] At 3:56 p.m., the Court reconvened without the jury present and the defendant moved for a mistrial. (Docket #29 at 10). The jury returned at 4:06 p.m. (Docket #29 at 10). At 4:08 p.m., the Court questioned Juror Number One directly about whether she had misunderstood the polling question and she responded in the affirmative. The defense then requested a third polling of the jury, in which each juror individually affirmed that it was and is their final verdict. (Docket #29 at 10). At no point did the defendant request to poll Juror Number One individually outside the presence of the rest of the jury.

Without any citation, the defendant argues that the Court abused its discretion by "failing to conduct an individual *voir dire* of [Juror Number One] to determine the credibility of a claim of misunderstanding of the polling question *and* whether she was coerced or induced to sign a verdict to which she did not fully assent. (Docket #42 at 27) (emphasis in original). In a signed affidavit, defense counsel asserts that "he stood with the hope that he would be recognized by the Court before it dismissed the jury" and that he "intended to request that the Court conduct individual voir dire outside the presence of the jury but that the Court did not recognize him." (Docket #43 at 2).

The record, however, does not support the defendant's assertion. As indicated above, the Court reconvened outside the presence of the jury for approximately ten minutes before the jury returned. (Docket #29 at 10). At no point during that time did the defendant request that Juror Number One be questioned individually. Further, once the jury returned (at approximately

---

[10] The note from the jury was signed by two jury members other than Juror Number One. (Docket #34).

4:06 p.m.), and the Court questioned Juror Number One in open court (at approximately 4:08 p.m.), six minutes passed before the panel was dismissed. (Docket #29 at 10-11). Again, at no point did the defendant request that Juror Number One be polled outside the presence of the jury. The Court sincerely doubts that approximately six minutes passed without the Court noticing the defense counsel's attempt to make a motion.

Moreover, Federal Rule of Evidence 606(b) suggests that the Court may have in fact avoided error by refraining to conduct any individual voir dire in this instance. The Rule states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
>
> (2) Exceptions. A juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form.

Fed.R.Evid. 606(b). Thus, the plain language of the rule indicates that the Court was not permitted to inquire as to any internal influence during the course of the jury's deliberations. Fed.R.Evid. 606(b); *see also United States v. Schwartz,* 787 F.2d 257. 261 (7th Cir. 1986) (finding that "[a] juror may testify about 'extraneous prejudicial information' or any 'outside influence' on the jury, but nothing more."). As such, the Court finds that it did not abuse its discretion for failing to question Juror Number One outside the presence of the jury. Thus, the Court will deny the defendant's Motion for a New Trial.

5.    CONCLUSION

In sum, the Court finds that none of the defendant's arguments warrant a new trial in this case. First, the Court finds that the defendant waived his right to a *Batson* challenge and, absent waiver, the challenge would fail under the three-prong *Batson* test. Second, the Court finds that the evidence in this case supports the jury's guilty verdict and, therefore, will deny the Motion for Acquittal. Finally, the Court finds that there was no abuse of discretion in relation to the jury polling and continued jury deliberations, and will, therefore, deny the Motion to Vacate.

Accordingly,

IT IS ORDERED that the defendant's *Batson* challenge be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendant's Motion for Judgment of Acquittal (Docket #40) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendant's Motion for a New Trial (Docket #41) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the government's Motion to Seal (Docket #39) be and the same is hereby GRANTED.

Dated at Milwaukee, Wisconsin, this 26th day of January, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge